Filed 11/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B256009 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA097949) |
| v. | |
| GREGORY YUSUKE SHIGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas C. Falls, Judge. Reversed and remanded.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Defendant Gregory Yusuke Shiga appeals from a judgment of conviction entered after a jury trial. The case arose out of a single incident on April 15, 2011, in which defendant set fire to St. John Vianney Catholic Church in Hacienda Heights (St. John Vianney), and the fire spread to the rectory where priests were sleeping.

Defendant was subsequently charged with aggravated arson (Pen. Code, § 451.5, subd. (a)), arson of a structure (*id.*, § 451, subd. (c)), possession of flammable material (*id.*, § 453, subd. (a)), second degree burglary (*id.*, § 459), and arson of an inhabited structure (*id.*, § 451, subd. (b)). The information further alleged various conduct and status enhancements.

On appeal, defendant challenges the trial court's findings that he was competent to represent himself and competent to stand trial. He also challenges his convictions for arson of a structure and arson of an inhabited structure on the ground they are lesser included offenses to aggravated arson. Finally, he raises sentencing issues. We reverse and remand for further proceedings consistent with this opinion.

# FACTUAL BACKGROUND

A.     *The Offense*

On April 15, 2011, defendant set fire to St. John Vianney. The fire quickly spread to the roof of a two-story rectory, which was adjacent to the church separated by a 20-foot breezeway. The rectory served as the living quarters for several priests. Two of the priests were sleeping in the rectory when the fire started. One was awakened by the sound of glass shattering. He looked out his window, saw that the church was engulfed in flames, and saw the flames had traveled to the rectory and were within five feet from his bedroom window. He woke another priest in the rectory, made sure everyone got out of the building safely, and called 911. Once outside, the priest saw the roof above his bedroom, as well as above another priest's bedroom, was on fire.

When members of the Los Angeles County Fire Department initially arrived, the entire main building of the church, which was approximately 80 feet wide, 200 feet long, and 60 feet tall, was completely engulfed in flames. The flames rose 50 to 60 feet above the church roof line, and the roof and eaves of the rectory were on fire. Firefighters could not save any portion of the church.[1] By morning the fire had been mostly extinguished, although firefighters were still extinguishing spot fires.

B.     *The Investigation and Defendant's Arrest*

Investigators determined that an accelerant had been used, helping to ignite the fire and causing the fire to spread and burn quickly. The debris from the area around the altar contained rolls of toilet paper, which had been saturated with a medium petroleum distillate. On one side of the church, every other window had been opened, which provided more oxygen for the fire and allowed it to grow at a faster rate.

After the fire, several individuals informed law enforcement of encounters they had with defendant in the days and weeks before the fire. Defendant's former grade school teacher told authorities that defendant had visited her at her school approximately two weeks before the fire. Defendant asked the former teacher why a statue at St. John Vianney, which depicted Christ on the cross, seemed to be suffering so much, but the rest of the church was so beautiful. He talked about the Catholic church having a lot of money and having done a lot of bad things.

A member of St. John Vianney stated that on the afternoon of April 6, 2011, an Asian male came into a bible study team meeting at the church and questioned her and other women present at the meeting for approximately 15 minutes, asking questions such as where in the Bible does it talk about the Pope and where does it authorize the building

---

[1]     After the fire, the church had to operate out of a tent and lost 25 to 30 percent of its members. The cost to repair or replace what was damaged or destroyed by the fire was about $10.6 million.

3

of a Catholic church. When the church member suggested the man go talk to the pastor, the man declined and told her she needed to repent for her sins.

One of the priests also observed an Asian male walking down a hallway inside the priests' private residence. The man walked past the priest then disappeared from view. Later, the priest saw the same man standing outside looking at the roof of the church.

About mid-day on the day of the fire, a church member saw an Asian male walk up a side aisle and stop to look at the floor area behind a statue in the church and various other areas inside the sanctuary before eventually leaving.

At about 11:00 p.m. the same day, three youths were riding their skateboards around the church parking lot. An Asian male was sitting in his car, which was parked in the lot. The man got out of the car, walked over to the boys, told them to leave the property, and walked back to his car. The boys initially ignored the man and continued riding their skateboards, but left when the man came back over to them about 10 minutes later and told them to leave a second time.

Defendant's former school teacher, some of the women who attended the April Bible study team meeting at St. John Vianney, and two of the youths who were skateboarding in the church parking lot on the night of the fire were shown a photographic lineup containing defendant's picture. Several of these witnesses identified defendant from the photographic line-up.

Video footage from a surveillance camera inside the sanctuary area of the church also recorded a man, later identified as defendant, lighting a fire at the left side of the altar at approximately 11:54 p.m. on April 15, 2011.


C.    *Defendant's Statements*

On May 14, 2012, defendant was arrested. He was taken to the Norwalk sheriff's station, where an undercover detective, posing as an inmate, went into defendant's cell wearing an audio recording device to see if defendant would make any statements about the fire.

4

Defendant told the undercover detective, "I burned a church." Defendant stated that the fire "wasn't an accident," but he "didn't think people could get hurt." He said he had been to the church before and was pretty sure the priests were doing bad things to children. He "thought if I did that it would stop and the word would get around and they'll stop."

Defendant explained that he obtained the items used to start the fire by stealing a weed sprayer with a backpack attachment, Pine-Sol, toilet paper and a tiki torch from a Home Depot. He went to the church the day before to scope it out, and left a couple of windows open so that he could get back into the church. The night of the fire, defendant parked in the church parking lot, saw some people in the parking lot, and told them to leave. He entered the church through a window. Once inside the church, he opened "a couple windows" because "a fire needs air." Defendant put on the backpack weed sprayer and put toilet paper by the cross and the drapes. He "sprayed them all," "sprayed the ceiling and [he] thought [he] sprayed everything." Defendant lit the tiki torch and used it to light the toilet paper rolls and the drapes. After the fire started, he went back to his car and left.

Defendant said he was not scared because he had visited Catholic churches and every time he went he "saw statues and [he] could get a lot of information out of them." He said that he saw "a cross with Jesus on it and I couldn't read it and right when I was going home and I realized I was like 'oh right the message that you could get is that Jesus never got hurt.' Because he's God. I mean he's huge. So he didn't get hurt. So I realized well if I do this he's not gonna get hurt. And then I was like 'I can do this.'" Defendant also realized that "maybe the spirit world is helping me sometimes and protecting me and I realized well if I'm in there it's scary because the only thing I can be scared about is the spirits. I didn't think that I would get arrested."

Defendant also stated, "I did it because I was there and then I saw a girl go inside the . . . concession stand and then I was like 'whoa that can't happen' and then I kinda got mad and then—you know people just become protective." Defendant stated, "I wasn't trying to do anything to the priests I just thought if I do this it won't happen again and

5

then the word will also spread and if the word spreads and its knowledge then it won't happen."

Defendant was subsequently interviewed by two investigating officers. After waiving his *Miranda*[2] rights, defendant told the officers he did not try to kill the priests. Defendant stated he entered the rectory because he wanted to find out where the molestation occurred. He thought that "if this happened, the news will spread and that it would stop." He burned the church at night so that no one would be there and no one would get hurt.

Later, defendant asked the officers if he could "do a speedy trial? Does that mean that the court starts early?" One of the officers explained the trial procedure. Defendant asked how long a trial takes and "if I want a speedy trial, I ask for it at preliminary?" The officer told defendant, "You do. You tell your attorney."

After defendant was returned to his cell, he told the undercover detective, "I'm going to try to do a speedy trial but I doubt . . . the district attorney will allow me to do a speedy trial." This was because "[t]hey have DNA evidence on the toilet paper and stuff."

Defendant and the undercover detective also talked about a priest who almost did not get out of the rectory during the fire. Defendant said, "I wasn't trying to hurt him, that's the thing. The bad news is that they're trying to charge me with arson which is prison time. So, that means I can't take the plea deal." Defendant stated, "[t]he jury has to say I'm guilty. If the jury doesn't say I'm guilty then I should be let go. But it's going to take a couple of months for that to happen though. But my lawyer is not going to allow me to do that because he's going to say that they have all this proof so I don't want to take it to trial. But the people—if they know that my intention wasn't to hurt anyone some of them might say I'm not guilty. Because they're gonna know I was trying to do it for a good cause and they're gonna say, ok, you know, well—say I'm not guilty. And

---

2       *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

6

hopefully it's not a hung jury. Hopefully it's a decisive jury that will say I'm not guilty. If it's a hung jury I have to go back to trial again three times for a hung jury before . . . the case gets closed."

## PROCEDURAL BACKGROUND

A.   *Competency Hearing*

Before defendant's preliminary hearing, proceedings were held in the Mental Health Department of the Los Angeles Superior Court (Department 95) to determine defendant's competency to stand trial. On August 28, the court appointed Dr. Stone to prepare an in-depth report on defendant's mental competency.[3] Dr. Stone evaluated defendant and prepared a report, which concluded defendant was not mentally competent to stand trial. On October 19, 2012, based on the contents of Dr. Stone's report, the People requested the court appoint a second doctor, Dr. Knapke, to prepare another in-depth report. Dr. Knapke's report, dated in December 2012, concluded defendant was mentally competent to stand trial.

On December 19, 2012, defense counsel noted that Dr. Stone had determined defendant was mentally incompetent to stand trial and stated, "we had Dr. Sharma see [defendant] today just to see how he is doing, some semblance of a tiebreaker, I guess, and Dr. Sharma agreed that he is still competent and stabilized, consistent with Dr. Knapke's opinion." After receiving reports from Dr. Sharma and Dr. Knapke into evidence,[4] the court found defendant was "presently competent to stand trial."

---

[3]   Approximately one year earlier, on August 26, 2011, a doctor working in Department 95 briefly spoke to defendant in the court's lock-up facility while defendant was being held in custody on an unrelated misdemeanor charge. The doctor prepared a short report opining defendant was mentally competent to stand trial. A copy of that report was provided to Dr. Stone.

[4]   The record on appeal does not include any of the doctors' reports prepared during the Department 95 proceedings.

7

B.      *Defense Counsel's Request for a Continuance to Retain a Mental Health Expert and Defendant's Request to Represent Himself*

During the morning calendar on June 19, 2013, the court held an ex parte, in camera proceeding with defense counsel. Defendant was not present for the morning calendar because he refused to leave his jail cell, stating there was no reason to come to court.

At the beginning of the in camera proceeding, the court explained that the in camera was in response to a previous request by defense counsel to continue the trial date; defendant was against any continuance, was unwilling to waive time for trial, and wanted a trial within the time period. Defense counsel needed the additional time to seek the appointment of a mental health expert and to investigate a possible defense. Defense counsel added during the in camera hearing that he believed, based on evidence he had obtained, that defendant may not have had the requisite mental state necessary to commit the aggravated arson, a specific intent crime.[5]

The court asked if defendant had a mental condition which might prevent the necessary premeditation and deliberation. Defense counsel confirmed defendant was being housed in a mental ward and that a doubt as to defendant's competency to stand trial had been declared. Defense counsel stated that the case had been transferred to Department 95 for further proceedings, but that the case "very quickly came back" with a "quick determination" that defendant was competent to stand trial. Since that determination, defendant's sister had informed defense counsel that defendant had been regularly seeing a psychiatrist, who died the previous year. Defense counsel had received

---

5       Penal Code section 451.5, subdivision (a), provides in pertinent part, "[a]ny person who willfully, maliciously, deliberately, with premeditation, and with intent to cause injury to one or more persons or to cause damage to property under circumstances likely to produce injury to one or more persons or to cause damage to one or more structures or inhabited dwellings, sets fire to, burns, or causes to be burned, . . . any residence, structure . . . is guilty of aggravated arson if . . . [¶] . . . [¶] . . . [t]he fire caused property damage and other losses in excess of seven million dollars ($7,000,000)." (*Id.*, subd. (a)(2)(A).)

from defendant's sister defendant's psychiatric file about two weeks earlier, "and a quick look at it had a diagnosis of schizophrenia and delusions." Defense counsel had arranged for a video conference with defendant to talk about a possible plea of not guilty by reason of insanity, but defendant refused to enter an insanity plea "in any way, shape, or form."

Defense counsel stated he needed additional time to examine the potential for challenging the specific intent elements of the aggravated arson crime, to review discovery recently received from the prosecution, and to conduct further investigation. He believed he would be providing ineffective assistance if he proceeded to trial on the scheduled date without first investigating all of the issues in the case and needed at least an additional 40 days to get a report from the mental health expert.

When the matter resumed in open court, the court signed an extraction order for defendant to be brought to court before noon the same day. When defendant eventually appeared, the court found good cause to continue the case for 50 days pursuant to defense counsel's request. Defendant immediately objected and requested to represent himself. The court stated the defendant's request would be heard by a different judge later that afternoon. Defendant stated, "Right now ask for pro. per. Right now I would like to go pro. per., your honor." Defendant added that he did not want to waive time. The court told him he could bring that up in the afternoon. Defendant received, filled out, and signed an advisement and waiver of right to counsel under *Faretta*.[6]

C.    *Hearings on Defendant's Request To Represent Himself*

That afternoon, a pre-trial hearing was held before another calendar judge. The court advised defendant that he would be foolish to represent himself and it could be a "total disaster." Defendant said he understood, "but I believe I am prepared to be able to correctly defend myself." The court explained that defendant did not understand court

---

[6]    *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*).

procedure and stated defendant's education[7] would not assist him in representing himself. Defendant responded, "No, but I believe I could give the jury a different point of view."

The prosecutor suggested, apparently based on defendant's statements to the undercover detective, that defendant may be "under the misconception that if he doesn't waive time that he's going to force dismissals against him. And with three dismissals, he walks on this case." The prosecutor also stated that defendant had "a history of not appearing for court," and that the court in the past had to issue extraction orders. The prosecutor noted that all of the discovery could not be fully redacted before the scheduled trial date.

The court explained to defendant that if defendant wanted to represent himself and proceed to trial, he would be going to trial without any discovery. "Everything has to be redacted, and it can't be redacted that fast. So you go to trial with no tapes, no reports." Defendant responded, "Yes, your honor, I would love to."

On June 21, the matter was called for a hearing before the trial judge on defendant's *Faretta* request. The court explained to defendant that his counsel wanted to hire a mental health expert to give the court a report that might be able to assist defendant in negating the specific intent to commit aggravated arson, which the court explained was critical because the charge could "land [defendant] in prison for life." Defendant said he understood. The court added that if defendant chose to represent himself, he would not have that report. Defendant again stated that he understood. Defendant added, "I believe that I would like to go in a different way to defend this trial, your honor." The court asked if defendant was otherwise satisfied with his counsel's representation. Defendant said he was, "but not the current way he wants to defend it."

At that point, the trial court decided to conduct "a mini *Marsden*[8] hearing." In the absence of the prosecutor, defendant asked whether, if he were allowed to represent

---

7 Defendant indicated on the *Faretta* waiver that he attended college.

8 *People v. Marsden* (1970) 2 Cal.3d 118.

10

himself, his counsel would still represent him or be present. The court responded, "No, that's the problem. Look, that you have a disagreement with [counsel] about the psychiatrist he wants to hire is one thing. That's not reason to fire him." The court asked if defendant had any other complaints. Defendant said he did not. The court then discussed whether counsel could continue to represent defendant if he "waives effective assistance of counsel with regard to that issue alone, then you can proceed and represent him on the rest of the case." Counsel stated that "[w]hat the court is asking me to do is to commit malpractice, in my opinion."

Defense counsel stated he was not willing "to go forward and put [defendant's] freedom on the line just because [defendant] agrees to it." Counsel analogized, "[i]t's like asking a doctor to perform a surgery with a spoon." He might be able to perform it successfully, but he "may refuse to do it because he does not want to put his client's life or the surgery he's performing on the line." The court asked what about if he were in the field, and the choice were to perform surgery without the proper equipment or "to walk away, hand him the knife and say, 'cut yourself open and go forward.'"

Defendant interrupted and asked if the court was "basically saying that his defense of using the medical records would be absurd?" The court stated that was not what it was saying. The court tried to explain to defendant the defense that his counsel wanted to present on defendant's behalf and told defendant it "would save you, potentially, life in prison. That's why he's fighting so hard to get it." Defendant said he understood. The court added, "[a]nd it's not absurd." Defendant asked, "It's not?" The court responded, "No. It's not even remotely absurd."

The court gave defendant several reasons why defendant should not represent himself. In response, defendant said, "I understand, your honor. To the fullest point, I do understand, but I believe that I have a chance in this case being able to let the jury understand that even with all the evidence, the uncircumstantial evidence, that it won't pass beyond a reasonable doubt." The court pointed to defendant's use of the word "uncircumstantial evidence" and stated, "[y]ou used a word that the jury wouldn't even understand." The court explained his counsel was experienced, could do things correctly,

11

and would give him "the best defense available," while defendant's "chances of winning in this case against this [district attorney] are almost impossible . . . ." The court suggested to defendant that defendant wait 30 days, since he was going to be in jail anyhow, get the doctor's report, and then, if he decided he still wanted to represent himself, he could do so. Defendant said he was not willing to give his counsel the 30 days and really wanted to go to trial. The prosecutor returned to the courtroom, and the court informed her there was no *Marsden* request.

The court asked defendant if he were willing to "waive [counsel's] incompetency on [the mental defense] issue and have him remain as your lawyer?" Defendant said he was not and wanted to represent himself in any event. The court acknowledged defendant was making a *Faretta* motion and that "it is an unequivocal request for self-representation. It's not conditioned on whether or not there's a psych defense, but he wants to represent himself." The court again advised defendant that it was not a good idea, he was facing life imprisonment, and he was facing a prosecutor who had special training while defendant had none. Defendant said that he understood. The court gave defendant additional advisements. Defendant stated he understood to each, had no questions, and stated he still wanted to represent himself.

D.    *The Prosecutor's Request for the Trial Court to Conduct an Evaluation of Defendant's Mental Competency to Represent Himself*

After the court's *Faretta* advisements, the prosecutor stated that she wanted to make a record regarding *Edwards*.[9] The prosecutor pointed to the conflicting mental health evaluations performed in Department 95, stating that one doctor had opined defendant was not competent to stand trial, while another had found him competent. The trial court noted that it had spoken with defendant, he answered questions appropriately and appeared to know what he was doing. "So with all of that, he's making an informed

---

9    *Indiana v. Edwards* (2008) 554 U.S. 164 [128 S.Ct. 2379, 171 L.Ed.2d 345] (*Edwards*).

decision to represent himself. I just don't understand where you're going with this, but go ahead."

The prosecutor explained that defendant could have a mental defect affecting his capacity for self-representation and stated, "[i]t's more than the *Faretta* warnings. It's more than his answers to the *Faretta*." She stated that *Edwards* discussed obtaining a psychiatric evaluation to evaluate defendant's mental competency to represent himself, which is different from mental competency to stand trial. She noted that defendant had been previously diagnosed with schizophrenia and stated that, if defendant were convicted, his counsel could claim on appeal that the trial court "didn't do a proper analysis. It didn't have enough information before it to make a determination whether he was competent to self-represent . . . ." The prosecutor stated that defendant's mental health issues, his rejection of a mental defect defense, and numerous refusals to come to court and disruption of court proceedings all were "red flags to [the] court that we have to take a closer evaluation of [defendant], get the additional information" before making a decision.

The court stated it was "a little confused." It stated the prosecution could solve the issue by dismissing the aggravated arson count because it required proof of specific intent. The prosecutor explained that specific intent to commit the crime is a different issue from defendant being mentally competent to represent himself. She pointed out that the trial court had not yet reviewed the Department 95 mental health reports and that it should consider them before making a determination.

The court responded, "[a] bench officer who is specially trained in the mental health issues in Department 95 reviewed the mental health record, reviewed the reports from the doctors. Your office stood there and argued that he was competent to stand trial." "A decision was made that he was competent to stand trial. I don't take a second look at that." The prosecutor argued, "[b]ut it's not the competent to stand trial issue. We have a different issue. That's what the [United States] Supreme Court and the California Supreme Court say." In response, the trial court stated, "I'm finding that the defendant is competent to waive counsel. He has the mental capacity to understand the

13

nature and the object of these criminal proceedings. He . . . had the ability to consult with counsel. He can assist in the preparation of defense. He does not have to agree with the defense that his attorney is presenting, and he has a right to go pro. per. His request to go pro. per. is granted."

The court ordered counsel to redact as much of the discovery as possible and provide it to defendant by the afternoon. Defendant requested that he instead receive the material on Monday, the first day of trial, because he wanted Saturday and Sunday "to be able to have a rest after all my own studies I did before." The court asked if defendant understood that trial would start on Monday and he would not have a chance to look at any of the police reports beforehand. Defendant said he was fine with that.

E.      *The Prosecutor's Request for the Trial Court to Reconsider Conducting an Evaluation of Defendant's Mental Competency to Represent Himself*

On the day of trial, prior to the start of jury selection, the prosecutor informed the court that she and defense counsel had been able to redact approximately 1,000 pages of discovery, but was concerned the defendant had not yet had the opportunity to review any of the discovery. Defendant responded that he did not want any time to review the discovery and stated, "I'm already prepared."

The prosecutor asked the trial court to reconsider making a determination whether defendant was mentally competent to represent himself. She stated, "While I believe that [defendant] is competent to stand trial, I do not believe that he would be competent to represent himself based on what I have seen in regards to his mental health records, what his family has indicated. And so I believe he believes that he's ready to go forward without seeing any of the discovery, but I believe that that belief is based on part of the mental defect that he suffers. . . . I'm asking if the court would possibly reconsider doing an evaluation of [defendant] for his ability to represent himself."

The court responded, "[c]ounsel, you would be setting up, in my opinion, a new standard. There isn't a pro. per. defendant, not just [defendant], . . . who are competent to represent themselves. You know it. I know it. The appellate courts know it. Our hands

14

are tied because he has an absolute constitutional right to defend himself.  Had Department 95, which is the specialized psychological court, determined he's not competent, it would be a different story, but it's not.  I shouldn't treat him any different than I would from any other defendant who is sitting in county jail who wants to represent himself.  To do so, I would be setting up a different standard, and then we would be having these requests for every defendant."  The court added that "[i]n order to do what you're asking, I would be violating the very right [defendant] is demanding, which is his speedy trial."  As long as defendant filled out the *Faretta* waiver form with appropriate answers and behaved appropriately, "I don't believe I have got the right to tell him no, so I will decline the request."

F.    *The Trial*

During trial, defendant made no opening statement or closing argument.  He did not cross-examine most of the witnesses.  His questions to those witnesses he did cross-examine elicited no evidence relevant or favorable to his defense.  He did not take the stand in his own defense and rested without presenting any defense to the charges.

The jury found defendant guilty on all five counts and found true all special allegations.  He was sentenced to an aggregate term of 15 years to life in state prison.

DISCUSSION

A.    *The trial court erred in failing to recognize it was within its discretion to conduct an inquiry regarding defendant's mental competency to represent himself and, if necessary, to deny defendant's* Faretta *request.*[10]

1.    *Overview of Governing Law*

A defendant has the right under the Sixth and Fourteenth Amendments to represent himself when the defendant, after being advised of the dangers and risks and consequences, "voluntarily and intelligently elects to do so." (*Faretta, supra*, 422 U.S. at p. 807; *People v. Joseph* (1983) 34 Cal.3d 936, 943.) The defendant in *Faretta* was "literate, competent, and understanding." (*Faretta*, *supra*, at p. 835.) The *Faretta* court was not called upon to address the standard of mental competency needed to claim the right of self-representation.

*Godinez v. Moran* (1993) 509 U.S. 389 [113 S.Ct. 2680, 125 L.Ed.2d 321] (*Godinez*) was the first Supreme Court case to consider metal competence and the right of self-representation together. (*Edwards*, *supra*, 554 U.S. at p. 171.) In *Godinez*, the defendant, a borderline mentally competent criminal defendant, requested to represent himself and plead guilty to three counts of first degree murder to avoid mitigating evidence being presented on his behalf at sentencing. (*Godinez*, *supra*, at pp. 391-392.) The trial court granted the defendant's *Faretta* request, finding the defendant's waiver of the right to counsel was knowing and intelligent. (*Id.* at pp. 392-393.) It accepted the defendant's guilty pleas and sentenced the defendant to death for each of the murders. (*Id.* at p. 393.)

---

[10]    A trial court's failure to exercise discretion may also constitute an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847-848.) "[W]e review such action in accordance with that standard of review." (*In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 515.)

The Ninth Circuit Court of Appeals overturned the convictions, concluding that, because the record suggested the defendant was mentally incompetent to waive his right to counsel, the due process clause required the trial court to hold a hearing to determine the defendant's mental competency to waive counsel before accepting the defendant's guilty plea. It also held that the trial court should have applied a higher standard of competency to waive the right to counsel than the competency required to stand trial. (*Godinez*, *supra*, 509 U.S. at pp. 393-394.)

The Supreme Court reversed. It "reject[ed] the notion that competence . . . to waive the right to counsel must be measured by a standard that is higher than (or even different from) the" long-established standard articulated in *Dusky*[11] (*Godinez*, *supra*, 509 U.S. at p. 398)—namely, whether the defendant has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" (*Id.* at p. 396.) It reasoned the decision to plead guilty "is no more complicated than the sum total of decisions that a [represented] defendant may be called upon to make during the course of a trial." (*Id.* at p. 398.) Thus, "there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." (*Id.* at p. 399.) Even assuming that self-representation might pose special trial-related difficulties, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right* [under *Faretta*], not the competence to represent himself." (*Id*. at p. 399.) "[W]hile States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the Due Process Clause does not impose these additional requirements." (*Id.* at p. 402.)

In the years that followed, California Courts of Appeal generally interpreted *Faretta* and *Godinez* as prohibiting states from imposing additional competency

---

[11]    *Dusky v. United States* (1960) 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (*per curiam*).

17

restrictions on the right of self-representation if a defendant was found competent to stand trial under *Dusky*. (*People v. Lightsey* (2012) 54 Cal.4th 668, 694, 695 (*Lightsey*); *People v. Johnson* (2012) 53 Cal.4th 519, 526-527 (*Johnson*); see also *People v. Taylor* (2009) 47 Cal.4th 850, 874-876 [discussing several California Courts of Appeal decisions exemplifying this view].)

The Supreme Court put an end to this view with its decision in *Edwards*, *supra*, 554 U.S. 164. Edwards, who had been diagnosed with schizophrenia and delusions and had twice been found incompetent to stand trial, unsuccessfully asked to represent himself shortly before his first trial, which resulted in a hung jury on the charges. (*Id.* at pp. 167-168.) When Edwards renewed his request for his retrial, the trial court recited Edward's lengthy psychiatric history and concluded Edwards was mentally competent to stand trial, but *not* mentally competent to represent himself. (*Id.* at p. 168.) Edwards successfully appealed, arguing the trial court's refusal to allow him to represent himself violated his constitutional rights under *Faretta*. (*Id.* at p. 169.)

The Supreme Court reversed, holding that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards*, *supra*, 554 U.S. at p. 178.) The Supreme Court referred to these type of defendants as "gray-area defendant[s]." (*Id.* at p. 173.)

The Supreme Court distinguished *Godinez* on two grounds: (1) the defendant in *Godinez* was only seeking to waive the right to trial, not actually conduct trial proceedings; and (2) the state in *Godinez* was seeking to permit self-representation by a gray-area defendant, not deny it, as was the case in *Edwards*. (*Edwards*, *supra*, 554 U.S. at p. 173.) The court noted that the *Dusky* competency standard assumes the defendant is represented by counsel, acknowledges the importance of that representation, and thus suggests, in circumstances where waiver of counsel is requested, that a different standard of competency should be applied. (*Edwards*, *supra*, at pp. 174-175.)

18

The court also recognized that mental illness can vary in degree and over time and that it "'can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.'" (*Edwards*, *supra*, 554 U.S. at p. 176.) It acknowledged that allowing a defendant who lacks the mental capacity to conduct his own defense the right of self-representation will not "'affirm the dignity'" of that individual (as was one of the bases articulated in *Faretta* for recognizing the right of self-representation), will not be fair, and will not promote the appearance of fairness to all who observed the proceedings. (*Id.* at pp. 176, 177.) The Supreme Court concluded that there is little reason to believe the *Dusky* standard alone would be sufficient in circumstances where a gray-area defendant seeks to represent himself during trial. (*Edwards*, *supra*, at p. 177.) The court thus held that the Constitution permits states to deny self-representation to gray-area defendants who may be mentally competent to stand trial, but "still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id*. at p. 178.) Further, it stated that trial courts are often in the best position to make those determinations. (*Id*. at pp. 177-178.) The Supreme Court declined to adopt a more specific standard of mental competency for self-representation as a federal constitutional standard, but indicated states may do so under certain circumstances without violating the right of self-representation under *Faretta*. (*Id.* at pp. 178-179; *People v. Taylor*, *supra*, 47 Cal.4th at p. 874.)

Adopting the mental competency-related limitation on self-representation authorized by *Edwards*, the California Supreme Court in *Johnson, supra,* 53 Cal.4th 519 held California courts have the discretion to deny a gray-area defendant's right to self-representation "in those cases where *Edwards* permits such denial" and, in fact, "to refuse to recognize such discretion would be inconsistent with California's own law." (*Id*. at p. 528.) In so holding, the court declined to formulate a more specific standard than *Dusky* when considering a defendant's mental state as a reason for denying self-representation. (*Id.* at p. 530.) Instead, "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the

19

defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Ibid*.)

The court noted that "[a] trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Johnson*, *supra*, 53 Cal.4th at p. 530.) When a court "doubts the defendant's mental competence for self-representation, it may order a psychological or psychiatric examination to inquire into *that* question." (*Ibid*.) The court then has the discretion to deny self-representation if it determines the defendant falls within the category of a gray-area defendant.

### 2.    *Analysis*

Defendant argues that the trial court erred in granting his *Faretta* request because the trial court was unaware it had discretion under *Edwards* and *Johnson* to determine whether defendant was competent to waive his right to counsel. We agree.

"The general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496; see also Evid. Code, § 664.) The presumption is overcome by an affirmative showing of error in the record. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549-550.)

Here, it is apparent from the record that the trial court was unaware that it had the discretion both to conduct an inquiry regarding whether defendant was mentally incapable of representing himself and, if necessary, to deny defendant's *Faretta* request on that ground. In response to the prosecutor's request for the trial court to determine under *Edwards* whether defendant was competent to represent himself, the trial court stated, "[a] decision was made that he was competent to stand trial. I don't take a second look at that." When the prosecution urged the trial court to reconsider, the trial court stated that making a separate determination regarding the defendant's mental competency

20

to represent himself would be setting "a new standard,"[12] that its "hands are tied because [defendant] has an absolute constitutional right to defend himself," and "as long as he behaves and he comes out to court, I don't believe I have got the right to tell him no."

Under *Edwards* and *Johnson*, however, the standard had already been established.

Moreover, there was sufficient evidence in the record to raise a doubt regarding defendant's mental competency to represent himself. The court was aware defendant had been placed in Department 95 proceedings. Two doctors had prepared in-depth reports, one of whom concluded defendant was not competent to stand trial. The prosecutor also informed the court that defendant had previously been diagnosed with schizophrenia and that, based on her review of defendant's mental health records, he may have been suffering from a "mental defect" that was affecting his decision to proceed to trial without any assistance or preparation. Indeed, when the court informed defendant he would be proceeding to trial without being able to review any discovery, defendant stated, "Yes, your honor, I would love to." The trial court also was aware that defendant's counsel, prior to being discharged, was seeking to have defendant examined by a mental health expert, and believed defendant may have had a viable insanity defense.

The prosecutor pointed to defendant's mental health issues, his rejection of an insanity defense, his repeated refusals to leave his cell and come to court, and his disruption of prior court proceedings as being red flags to the court that it needed to conduct a separate evaluation of defendant's mental competency to represent himself.

---

[12] The record also indicates the trial court failed to distinguish the difference between a defendant being mentally competent to waive the right to counsel with the general competence of a non-legally trained defendant to wage a defense to criminal charges. In addition to stating that the court would be setting a "new standard" if it made a separate determination regarding defendant's competency to represent himself, the court also stated "[t]here isn't a pro. per. defendant, not just [defendant], . . . who are competent to represent themselves. You know it. I know it. The appellate courts know it."

Evidence in the record regarding defendant's statements to investigators also suggests that defendant may not have been able to "carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson, supra*, 53 Cal.4th at p. 530.) Defendant told the undercover detective that if the jury knew "I was trying to do it for a good cause and they're gonna say, ok, you know, well—say I'm not guilty." Defendant's statements suggest that defendant may have been under some delusion about his conduct and the proceedings and did not appreciate what a defense would entail. It also appeared that defendant lacked an understanding of what it meant to have a speedy trial right, an apparent basis for his decision to represent himself. Defendant told Detective Osorio, "I'm going to try to do a speedy trial but I doubt . . . the district attorney will allow me to do a speedy trial" because "[t]hey have DNA evidence on the toilet paper and stuff." It appeared that he was under the impression that a speedy trial meant the trial would take a shorter period of time and would avoid the introduction of certain evidence against him.

Further, although defendant told investigators that he did not intend to hurt anyone and that his intent was to send a message to the Catholic church to stop molestation from occurring, he failed to make these points, which could have arguably constituted a defense. The record does not indicate that defendant gave jurors "a different point of view," as he had told the trial court he would do if allowed to represent himself. Instead, at trial, defendant's defense was virtually nonexistent. He did not argue that he burned the church for what he believed to be a good reason or that he did not intend to hurt anyone. In addition, he did not ask questions of the witnesses to make either of his points clear, did not take the stand in his defense, and made no closing argument.

The trial court thus erred in failing to recognize it was within the court's discretion to conduct an inquiry to determine if defendant was mentally competent to represent himself and, if necessary, to deny the *Faretta* request.

B.	*The trial court erred in failing to recognize it was within its discretion to inquire whether a second hearing regarding defendant's mental competency to stand trial should be ordered.*

Defendant argues that the trial court erred by failing to conduct its own inquiry regarding defendant's mental competency to stand trial when defendant requested to represent himself or, at the very least, when it became apparent that defendant would not be presenting a defense. He argues the trial court was presented with enough new information from defense counsel prior to him being discharged and during the pretrial and trial phases of the case to cast doubt on defendant's mental competency, notwithstanding defendant being found mentally competent to stand trial during the Department 95 proceedings. We agree.

The due process clause of the Fourteenth Amendment and state law both prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. (*People v. Mai* (2013) 57 Cal.4th 986, 1032; see also Pen. Code, § 1367, subd. (a); *Drope v. Missouri* (1975) 420 U.S. 162, 172 [95 S.Ct. 896, 43 L.Ed.2d 103]; *Pate v. Robinson* (1966) 383 U.S. 375, 384–386 [86 S.Ct. 836, 15 L.Ed.2d 815].) A defendant is mentally incompetent to stand trial, if, due to a mental disorder or developmental disability, "the defendant is unable to understand the nature of the criminal proceedings or[, if represented by counsel,] to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a); see also *Dusky*, *supra*, 362 U.S. at p. 402 [a defendant is mentally incompetent if he lacks a "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" or lacks "'a rational as well as factual understanding of the proceedings against him'"].) If, during the pendency of a case and prior to judgment, a doubt arises in the mind of a judge concerning the defendant's mental competence to stand trial, the court must appoint counsel (if the defendant is not represented) and recess the proceedings to allow the counsel time to confer with the defendant and form an opinion regarding the defendant's mental competency. (Pen. Code, § 1367, subd. (a).)

23

If presented with less than substantial evidence, the court *may* in its discretion hold a hearing to determine the present mental competence of the defendant, even if neither party requests a hearing. (Pen. Code, § 1367; *People v. Welch* (1999) 20 Cal.4th 701, 742; *People v. Pennington* (1967) 66 Cal.2d 508, 518.) The court's determination is reviewed for an abuse of discretion. (*Welch*, *supra*, at p. 742.) When, however, substantial evidence of a defendant's mental incompetence to stand trial is presented, due process requires that the trial court conduct a full competency hearing. (*Lightsey*, *supra*, 54 Cal.4th at p. 692; *People v. Jones* (1991) 53 Cal.3d 1115, 1152; see *Pate v. Robinson*, *supra*, 383 U.S. at p. 377.) "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial." (*Jones*, *supra*, at p. 1152.)

If a competency hearing has already been held where the defendant was found competent to stand trial, a trial court need not suspend proceedings to conduct a second competency hearing unless it "'"is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.'" (*People v. Mendoza* (2016) 62 Cal.4th 856, 884, quoting *People v. Jones*, *supra*, 53 Cal.3d at p. 1153.) Throughout the proceedings, a trial court must remain alert to circumstances suggesting a substantial change rendering the accused unable to meet the standards of competence to stand trial. (*Mendoza*, *supra*, at p. 885.)

In the present case, as with defendant's mental competence to represent himself, there was conflicting evidence in the record regarding defendant's competency to stand trial. As stated previously, Dr. Stone had evaluated defendant during the Department 95 proceedings and concluded defendant was not mentally competent to stand trial, while Dr. Knapke had concluded that defendant was mentally competent. Based, in part, on Dr. Knapke's opinion, the court in Department 95 found defendant competent.

However, several weeks before the trial, defendant's counsel learned that defendant had been regularly seeing a psychiatrist, who had died the previous year. Defense counsel had obtained and quickly reviewed defendant's psychiatric file and learned from the review that defendant had been diagnosed with schizophrenia and

24

delusions.[13]  Based on this information, defendant's counsel requested from the trial judge a continuance to seek appointment of a mental health expert to evaluate defendant's mental competency.  If granted the continuance, the mental health expert's opinion may have also served as a basis to request a second competency hearing.  (See *Drope v. Missouri*, *supra*, 420 U.S. at p. 177 [the defense counsel's "somewhat inartfully drawn motion for a continuance" requesting a further psychiatric exam before trial raised the issue of the defendant's competence to stand trial].)

However, defendant vehemently opposed appointment of a mental health expert and asserted this opposition as his sole reason for seeking to waive counsel.  When the trial court granted defendant's *Faretta* request and discharged defense counsel without first appointing a mental health expert or conducting any inquiry under either *Edwards* or Penal Code section 1368, the trial court effectively foreclosed any possibility that the issue of defendant's mental competence to stand trial would be raised, or a second competency hearing would be requested, by the defense.  In so doing, it also removed an important safeguard in defendant's criminal proceeding.  (See *Lightsey*, *supra*, 54 Cal.4th at pp. 696-697 ["if . . . a criminal defendant whose mental competence is in question is permitted self-representation and to maintain he or she is competent to stand trial, a breakdown occurs in the process of meaningful adversarial testing central to our system of justice"].)

The result is all the more troubling because the record indicates that the trial court was unaware of its discretion to conduct an inquiry and order a second competency hearing if it had a doubt regarding defendant's mental competency to stand trial.  In response to the prosecutor's argument under *Edwards* that defendant's prior diagnosis of schizophrenia, rejection of a mental defect defense, repeated refusal to attend and

---

[13]    Because the doctors' reports were not included in the record and, as discussed below, the court did not make any findings regarding this information and its relation to defendant's mental competency to stand trial, it is unclear whether this information was considered during the Department 95 proceedings or whether it constituted "new evidence" relevant to the validity of the Department 95 mental competency finding.

disruption of court proceedings were all "red flags," the trial stated, "[a] bench officer who is specially trained in the mental health issues in Department 95 reviewed the mental health record, reviewed the reports from the doctors. . . .  A decision was made [in Department 95] that [defendant] was competent to stand trial.  I don't take a second look at that."[14]  Because there was sufficient evidence then known to the trial judge to, at least, foster a doubt regarding defendant's mental competency to stand trial at that time, the trial court's failure to recognize it was within its discretion to make further inquiry regarding whether such evidence was substantial and/or warranted ordering a second competency hearing was error.

C.     *The Trial Court's Errors Require Reversal*

Defendant argues that the trial court's errors were prejudicial per se and thus require reversal without undertaking any harmless error analysis.[15]  We agree.

---

[14]     When the prosecutor then stated she was not arguing "the competen[cy] to stand trial issue," the trial court responded, "I'm finding that . . . defendant is competent to waive counsel.  He has the mental capacity to understand the nature and object of these criminal proceedings.  He . . . had the ability to consult with counsel.  He can assist in the preparation of defense."  The trial court's response, when viewed in the context of all of the court's other statements concerning defendant's mental competency to stand trial and to represent himself, does not change our conclusion.

[15]     Defendant specifically argues the prejudice per se test is applicable to his challenge under *Edwards* because the trial court's error deprived him of his federal constitutional right to counsel.  However, our Supreme Court has already rejected this argument in *People v. Taylor*, *supra*, 47 Cal.4th at p. 877, holding that the trial court did not err as a matter of *federal* constitutional law in failing to exercise its discretion to deny an arguably gray-area defendant's request to represent himself.  (*Id.* at pp. 866-867.)  It reasoned that, because *Edwards* permits, but does not mandate, the application of a dual standard of competency for gray-area defendants, *Edwards* "does not support a claim of federal constitutional error in a case . . . in which defendant's request to represent himself was *granted*."  (*Id.* at p. 878, italics added.)  The court also did not find error under state law because the trial in *Taylor* predated the *Edwards* decision (and *Johnson*). Thus, under then binding federal and state authority, the trial court lacked the power to revoke self-representation based on any competency standard other than *Dusky* under which the trial court had already found defendant competent to stand trial.  (*Id.* at p. 881.)

26

Article VI, section 13 of the California Constitution provides in pertinent part: "No judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." This provision typically requires "a defendant who has established error under state law [to] demonstrate [prejudice by showing] there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result." (*Lightsey*, *supra*, 54 Cal.4th at p. 699; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.) However, the Supreme Court has recognized that, "'"'some errors . . . are not susceptible to the 'ordinary' or 'generally applicable' harmless-error analysis . . . and may require reversal of the judgment notwithstanding the strength of the evidence contained in the record in a particular case.'"'" (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1132, quoting *Lightsey*, *supra*, at p. 699.) "'[M]iscarriage of justice' [under the state Constitution] encompasses not only errors affecting the outcome of the case, but also certain procedural errors that may or may not have affected the outcome." (*Blackburn*, *supra*, at p. 1132.) In particular, "errors, which operate to deny a defendant an '"orderly legal procedure"' [citation], can entail a 'miscarriage of justice' under California Constitution, article VI, section 13." (*Id.* at p. 1133.)

"'[T]he kinds of errors that, regardless of the evidence, may result in a "miscarriage of justice" because they operate to deny a criminal defendant the constitutionally required "orderly legal procedure" . . . all involve fundamental "structural defects" in the judicial proceedings . . . .'" (*Lightsey*, *supra*, 54 Cal.4th at p. 699, quoting *People v. Cahill* (1993) 5 Cal.4th 478, 493.) Such errors are "'analogous to'" those identified in the United States Supreme Court's decision in *Arizona v. Fulminante* (1991)

---

Likewise, the California Supreme Court in *Johnson* found no state constitutional error where a trial court *denies* a gray-area defendant the right of self-representation in those cases where *Edwards* permits such denial. It noted that "California law provides *no* statutory or constitutional right of self-representation." (*People v. Johnson, supra*, 53 Cal.4th at p. 528.)

27

499 U.S. 279, 290 [111 S.Ct. 1246, 113 L.Ed.2d 302] (*Lightsey*, *supra*, at p. 699), including depriving a defendant of counsel, using defendant's coerced confession in a criminal trial, or trying a defendant before a biased judge (*Fulminante*, *supra*, at p. 290).

In *Lightsey*, the Supreme Court held that the failure to appoint counsel to represent a defendant during a competency proceeding, in violation of a state statute, is an error that is "'analogous to' a structural error referred to in *Fulminante*." (*Lightsey*, *supra*, 54 Cal.4th at p. 699.) The court explained that such an error defied review because, if counsel had been appointed, there were "myriad possible strategic choices counsel might have made that could have affected the outcome, for example, by choosing a defense expert different from the expert defendant chose, [or] asking for a third expert to break the tie between the two experts already consulted . . . ." (*Id.* at p. 701.) Moreover, "the evidence presented regarding [the] defendant's competence was conflicting." (*Ibid.*) The court recognized the rule that "'when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage . . . , reversal is automatic.' [Citation.]" (*Id.* at p. 699.) As to structural errors affecting the protective framework within which the trial proceeds, the court stated, ""'[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."' [Citation.]" (*Id.* at pp. 700-701.) The court thus concluded that the trial court's failure to appoint counsel to represent the defendant during the competency proceeding fell within the type of error that was a "reversible miscarriage of justice" under the California Constitution. (*Id.* at p. 702.)

In *People v. Bigelow* (1984) 37 Cal.3d 731, the Supreme Court concluded that per se reversal was appropriate where the trial court failed to exercise its discretion to appoint advisory counsel for a self-represented death penalty-eligible defendant under circumstances where the denial amounted to an abuse of discretion. (*Id.* at pp. 744-746.) The trial court in *Bigelow* denied the defendant's request for advisory counsel, believing that appointment of advisory counsel was not permitted under California law. (*Id.* at p. 740.) The defendant was allowed to represent himself in both the guilt and penalty

28

phase of his trial and did so ineffectively. He was convicted and was sentenced to death. (*Id.* at pp. 740-742.)

The Supreme Court reversed the conviction, holding that because the trial court "[m]istakenly believ[ed] it had no authority to appoint advisory counsel, the trial court failed to exercise its discretion." (*People v. Bigelow*, *supra*, 37 Cal.3d at p. 743.) It acknowledged that, although the defendant did not have a constitutional right to the appointment of advisory counsel under either federal or state law, he did have the right to the trial court's "considered exercise of judicial discretion." (*Id.* at p. 745.) The court found that the failure to exercise discretion, "in itself serious error, gain[ed] in significance because on the record in [that] case it would have been an abuse of discretion to deny the request for advisory counsel." (*Id.* at p. 743.)

The court applied the per se reversal standard because it was impossible to determine "the effect of the absence of counsel upon the presentation of the case." (*People v. Bigelow*, *supra*, 37 Cal.3d at p. 745.) The court also reasoned that a capital case generally involves complex legal and factual issues beyond those in a typical felony trial, that the case before it presented particularly complex issues, and that the California Legislature had enacted legislation providing for the appointment of counsel in capital cases. (*Ibid.*)

Further, it explained, "[w]hen the right to counsel is at stake courts generally do not attempt to assess prejudice by speculating as to what tactics could have been employed, or what objections raised, by a better represented or advised defendant." (*People v. Bigelow*, *supra*, 37 Cal.3d at p. 744.) It stated, we have "no way to measure the prejudicial effect of error. What we know from the record is that [the defendant], representing himself, proved totally incompetent as a defense attorney, and that this trial of a capital case could rightly be described as a '"farce or a sham."'" [Citation.] What we do not know is whether [the defendant], aided by advisory counsel, would have done any better. The most we could do would be to identify points in the trial where competent counsel might have advised [the defendant] to do something different, wonder whether [the defendant] would follow the advice, and speculate about the impact of the advice on

29

the outcome of the trial. Even that effort would not disclose the possibility that counsel might advise [the defendant] to seek out evidence and witnesses which do not appear in the present record. Trying to assess prejudice in this setting would amount to 'speculation running riot.' [Citation.] A rule of per se reversal is the only way to protect the right of defendant to a conscientious exercise of judicial discretion on the appointment of advisory counsel, and to vindicate the state's independent interest in the fairness and accuracy of a capital proceeding. [Citation.]" (*Id.* at pp. 745-746; see *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010.)[16]

Although the present case does not involve a complex capital case, as was the case in *Bigelow*, or deprivation of the right to counsel during proceedings to determine a defendant's competency to stand trial, as was at issue in *Lightsey,* we nevertheless believe the principles enunciated in these two cases are instructive. The record in this case demonstrates that the trial court's failure to recognize it was within its discretion to assess defendant's competency to represent himself, as well as to order a second competency hearing, if necessary, may have affected the protected framework in which defendant's trial proceeded and may have resulted in a miscarriage of justice. (See *Lightsey*, *supra*, 54 Cal.4th at p. 700.)

As we stated previously, there is evidence in the record demonstrating the trial court's grant of defendant's request for self-representation and failure to inquire whether a second competency hearing was warranted may have been an abuse of its discretion. However, the record is incomplete on both the question of defendant's mental competency to represent himself and competency to stand trial because the trial court did not specifically address these issues. As such, we cannot be sure on this record that defendant was mentally competent to represent himself or to stand trial. By the same

---

16    Compare *People v. Crandell* (1988) 46 Cal.3d 833, 864-865 [holding where the record does not demonstrate in a noncapital case that the refusal to grant the request to appoint standby counsel would have been an abuse of discretion, *Bigelow* is distinguishable, and the failure of a court to exercise its discretion does not warrant per se reversal].

token, we cannot be sure defendant was mentally incompetent to represent himself or to stand trial.

Moreover, even if we were to attempt to apply the harmless error standard of prejudice to the issue of defendant's mental competency to represent himself, we cannot assess whether, if represented by counsel, the verdicts would have been any different, as the evidence against him was overwhelming. However, we do know defense counsel believed defendant had a viable defense based on defendant's mental illness, which could have negated the specific intent on the charge of aggravated arson and spared defendant a potential life term. Defense counsel did not have the opportunity to explore this defense after the court initially granted a continuance for this purpose, because defendant at that point chose to represent himself and the trial court allowed him to do so for the duration of the trial. As such, we have no way to measure the prejudicial effect of the trial court's error in failing to recognize it had the discretion to inquire whether defendant was competent to represent himself and to deny defendant's *Faretta* request if he was found mentally incompetent. Thus, under either standard of prejudice, reversal is appropriate.

D.      *Remand is Appropriate*

In *Lightsey*, the court determined the failure to appoint counsel to represent the defendant during his competency proceedings constituted reversible error, but concluded a limited remand to conduct a retrospective determination of the defendant's competency to stand trial was appropriate. In so holding, the court noted the error at issue did not involve the kind of case where the court "[could] be sure defendant was tried to conviction while *actually* mentally incompetent." (*Lightsey*, *supra*, 54 Cal.4th at p. 703, italics added.) "That type of substantive error clearly would require reversal of the entire judgment." (*Ibid.*) The court also noted the error did not involve a procedural constitutional due process violation where there was substantial triggering evidence of incompetence. (*Ibid.*; see, e.g., *People v. Pennington*, *supra*, 66 Cal.2d at p. 518 [the trial court's error in failing to hold a competency hearing where the defendant presented

substantial evidence of incompetence to stand trial required reversal of the judgment].)[17] Rather, it stated, "we cannot be sure [the] defendant in fact was mentally incompetent to stand trial, which . . . means he may have been *competent*, and if so there is no infirmity in the judgment . . . ." (*Lightsey*, *supra*, at p. 707.)

The *Lightsey* court recognized the inherent difficulties in conducting a retrospective hearing on the defendant's competence at the time he was tried. However, it also acknowledged that "[a]n automatic full reversal with a remand for a new trial on the criminal charges would impose severe costs on the justice system in remedying a violation that, while considered a miscarriage of justice in the context of the competency proceedings, might not have affected the guilt and penalty verdicts." (*Lightsey*, *supra*, 54 Cal.4th at p. 707.) It concluded that if it remained possible to give the defendant "a fair and reliable opportunity to prove his incompetence with the assistance of counsel[,] a remand to explore the feasibility of a retrospective hearing" was a permissible and appropriate remedy. (*Ibid.*; see also *People v. Ary* (2004) 118 Cal.App.4th 1016, 1029 [holding that, in light of the substantial evidence that the "mentally retarded" defendant was unable to understand the nature of the proceedings against him or to assist in his defense, the trial court's error in failing to hold a competency hearing for the defendant warranted a remand for the trial court to determine whether a retrospective competency hearing could cure the error].) The Supreme Court acknowledged "the passage of time since the trial, while a significant concern, does not necessarily make it impossible for a fair and reliable retrospective" determination (*Lightsey*, *supra*, at p. 709), and concluded, "we see no reason not to 'at least attempt to have the trial court resolve the matter on remand.' [Citation.]" (*Ibid.*)

---

[17]    The California Supreme Court stated it was not expressing any view on how to remedy an error involving a procedural constitutional due process violation where there was substantial triggering evidence of incompetence. (*Lightsey*, *supra*, 54 Cal.4th at pp. 703-704.)

Similarly, here because there is sufficient evidence in the record to conclude defendant may have been incompetent to represent himself, as well as sufficient evidence casting a doubt on his mental competence to stand trial, and contemporaneous evidence regarding his mental competency may exist, given the Department 95 proceedings, we conclude remand is appropriate. On remand, the trial court must determine within 60 days if it is feasible to assess whether defendant was competent both to represent himself and to stand trial at the time of trial. In other words, the court must determine if there is "'sufficient evidence to reliably determine . . . defendant's mental competence when tried earlier.'" (*Lightsey*, *supra*, 54 Cal.4th at p. 710.) Factors relevant to that determination the trial court should consider are: "'''''(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial.'''''" [Citation.]" (*Ibid.*) "Because of the inherent difficulties in attempting to look back to the defendant's past mental state [citation], the burden of persuasion will be on the People to convince the trial court by a preponderance of the evidence" that such a determination is feasible in this case. (*Id.* at pp. 710-711.)

If the trial court determines it is *not* feasible to retrospectively determine at the time of trial whether defendant was mentally competent to represent himself and to stand trial or, after a fair evaluation of all of the available evidence, the court concludes either it should have exercised its discretion to deny defendant's *Faretta* request or should have found defendant mentally incompetent at the time of trial, then reversal of the *judgment* is appropriate. If, however, such a determination is feasible, and the court concludes, after a fair evaluation of all of the available evidence, that defendant was mentally competent to represent himself at the time he was tried and that he was mentally competent to stand trial, we will consider the remaining issue in this appeal.

## DISPOSITION

Reversed and remanded for further proceedings consistent with this opinion.


GARNETT, J.[*]


We concur:


PERLUSS, P. J.


ZELON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.