Filed 12/26/23  P. v. Jones CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>THOMAS DEAN JONES,<br><br>        Defendant and Appellant. | A165177<br><br>(Mendocino County<br>Super. Ct. No.<br>   SCUKCRCR2036203) |

Defendant, who represented himself at trial, was convicted by a jury of first degree murder (Pen. Code, §§ 187, subd. (a), 189; count one)[1] and attempted first degree murder (§§ 187, subd. (a), 664; count two).  As to the murder count, the jury found true the special circumstances that the murder was committed for financial gain (§ 190.2, subd. (a)(1)) and by lying in wait (§ 190.2, subd. (a)(15)).  The jury also found true the allegation that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and that defendant had suffered six prior serious felony convictions.  On appeal, defendant argues he was not competent to represent himself and he did not make a knowing waiver of his right to counsel.  He also argues there was insufficient evidence to support

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

the financial gain and lying-in-wait special circumstances.  Finally, he contends, and the People concede, that the trial court erred in calculating the sentencing enhancements for his prior convictions.[2]

We affirm the conviction but remand to the trial court for correction of the conceded sentencing error regarding defendant's prior convictions.

## BACKGROUND

Before we address the evidence presented at the murder/attempted murder jury trial, we first discuss the background of the proceedings regarding defendant's competency to stand trial and his request to represent himself.

## I.    *Competency Hearing*

On November 17, 2020, defendant's trial counsel declared a doubt as to defendant's competency to stand trial.  The trial court suspended the proceedings and appointed two doctors to evaluate defendant.  Dr. Jessica Ferranti's report concluded that defendant was not competent to stand trial.  Dr. Kevin Kelly's report concluded defendant was competent to stand trial.  Following receipt of the conflicting reports, the trial court conducted a jury trial on the issue of defendant's competency to stand trial.  (§ 1369.)

Defendant testified that he "claimed to hold some titles in the people's portion of the civil government" and that he was "head of the psychological warfare division" and the "New Guard . . . ."  He believed he has "[d]iplomatic immunity" from prosecution as "the people's chair."  His primary motivation

---

[2] We acknowledge that on May 27, 2022, December 27, 2022, February 17, 2023, and May 15, 2023, this court received letters from the defendant in propria persona.  We decline to file these documents because defendant is represented by counsel.  A criminal defendant does not have a right to appear before this court in propria persona or as cocounsel.  (*People v. Clark* (1992) 3 Cal.4th 41, 173; *People v. Scott* (1998) 64 Cal.App.4th 550, 579.)

for going to trial "has always been to get the government to call for conventions of the people . . . to ratify . . . gun control, abortion, freedom of religion, freedom of speech, [and] all of the things that have been taken away recently and for the last hundred years." He acknowledged that his political beliefs did not contribute to the crime and that he could separate the crime from his political views. Defendant had talked with his attorney about the specifics of the case and possible defenses. He stated he was willing to work with his attorney to find the strongest possible defense.

Dr. Ferranti, a forensic psychiatrist, testified that she diagnosed defendant with delusional disorder, grandiose type. She found that defendant did not have a communication deficit; nor did he have cognitive problems, a developmental delay, or a mental disability. He understood the criminal proceedings. However, Dr. Ferranti did not believe defendant was able to rationally assist his attorney because his delusions prevent him from being able to do so. During her discussions with defendant, he focused on his political and religious views and went on tangents about the government and quoted from the Federalist Papers. Defendant told Dr. Ferranti that he was not interested in defending his case but, rather, was focused on conveying a political message. He believed he should have immunity because he is the leader of an organization he refers to as "the sphere of people's action . . . ." Dr. Ferranti opined that because defendant is preoccupied with grandiose fantasies, he is not able to consult rationally with an attorney.

Dr. Kelly, a forensic psychologist, testified that defendant understood the status and circumstances of the case against him. He was able to talk about the facts and issues. Dr. Kelly described essays defendant wrote as similar in content to talk radio shows and Internet sites in that they referred to conspiracy, governmental overreach, infringement of individual rights and

3

necessary changes to the system. Defendant understood that his beliefs were not necessarily shared by the general public. Dr. Kelly was able to redirect defendant when he veered off topic during their discussions. Dr. Kelly acknowledged there was grandiosity in defendant's writings, but he did not see defendant display grandiosity in their discussions. Dr. Kelly did not believe that defendant's grandiosity was at a level that is a mental health disorder. Based on tests Dr. Kelly administered to defendant and Dr. Kelly's own observations of defendant, Dr. Kelly found no evidence of a mental disorder. Defendant had schizoid and paranoid personality characteristics, but they were not at a level that impaired his competency to stand trial. Dr. Kelly believed that defendant had the capacity to assist in his defense and would be able to separate his political ideas from his legal defense. On August 13, 2021, the jury found defendant mentally competent to stand trial. Defendant does not contest this finding.

## II.    *Faretta Hearings*

On September 20, 2021, defendant asked to represent himself. On October 5, 2021, defendant filed a *Faretta*[3] form stating that he understood his constitutional rights and the dangers and disadvantages of self-representation. At the hearing on defendant's motion to represent himself, Judge Shanahan confirmed with defendant that he understood his right to counsel, his right against self-incrimination and his right to a speedy trial. She then told defendant that "representing yourself is never wise" and that he would be expected to comply with the Evidence Code. She further stated that she reviewed some of the documents from defendant's case and knew he had "some ideas about the government," and then she explained that "if it doesn't follow proper rules of evidence, some of that information may not be

---

[3] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].

4

allowed to come in at trial." Defendant confirmed that he understood. Judge Shanahan then explained that defendant would be opposing the prosecutor, who was a very experienced trial attorney. Defendant again confirmed that he understood. Defendant also told the judge that he understood the maximum sentence was 137 years to life without parole. Judge Shanahan again referred to some of defendant's letters regarding his ideas about the government and told him that they might not be admitted at trial and then stated: "I'm advising you that if you represent yourself, you may not be able to have the platform that you think you're going to have as far as your issues with the case." Defendant said he understood. Judge Shanahan granted defendant's motion to represent himself.

On December 2, 2021, at a pretrial conference before Judge Faulder, defendant filed two motions entitled: "Notice of Motion and Motion for Discovery" and "Notice of Motion Points Introduction and Motion of 995, to dismiss charges not legally made." Judge Faulder described the motions as follows: "[O]ut of 24 pages only one paragraph relates to anything of substance and most of the rest, if not all of the rest of the motion, are [*sic*] quotes from the Constitution and from historical figures, including numerous quotes from Alexander Hamilton, none of which helps the Court ensure that it's doing its duty in making sure that you are getting a fair trial in this matter." Judge Faulder stated he was concerned about defendant's competence to represent himself "despite the findings of Judge Shanahan on October 5th" and that he intended to reevaluate whether defendant should continue self-representation.

At the continued pretrial conference on December 28, 2021, Judge Faulder again expressed concern about defendant's self-representation and asked him a series of questions, including what charges defendant faced and

5

whether he understood that he would be trying his case against an experienced trial attorney and that he would be held to the same standards of preparedness, professionalism and decorum as the prosecutor. Defendant correctly stated that he was charged with murder and attempted murder and that he understood Judge Faulder's admonitions.

On January 14, 2022, Judge Faulder held a hearing after receiving two additional motions filed by defendant, entitled: "Notice of Motion and Motion for Change of Venue" and "Motion for Discovery of Jurisdiction." The prosecutor responded to the motions by stating that he anticipated making motions in limine asking the court to "strongly admonish the defendant that the issues will be whether he committed the murder, whether he used a firearm, whether he attempted to murder the second man, whether he had the six strikes. [¶] . . . [N]ot whether he holds the People's Chair in the People's Sphere of Action." Judge Faulder stated that the motions' headings listed real issues but that the bodies of the pleadings were essays of defendant's political beliefs and views and did not ask the court for relief or provide authority for the court to act. He again stated his concern about defendant's competency to represent himself and appointed Dr. Kelly to evaluate that issue.

On January 27, 2022, Dr. Kelly submitted his evaluation of defendant's competency to represent himself. The report explains that Dr. Kelly reviewed defendant's motions and the transcript of the January 14, 2022 hearing, including the prosecutor's reference to anticipated motions to exclude references to "the People's Chair in the People's Sphere of Action," and met with defendant on January 27, 2022. Dr. Kelly opined that defendant's mental status and behavior had not changed since he had been in custody. He did not observe any symptoms of psychosis but found that

6

defendant had a personality disorder and that strong schizoid personal traits accounted for defendant's difficulties representing himself. Defendant's mental status did not negatively impair his daily activities; nor did it require medication. Dr. Kelly found that defendant was "acting knowingly, intelligently, voluntarily, and that he is aware of the general dangers of self-representation." He also stated that defendant "anticipates in limine orders that he will disagree with, and he states that he will 'probably not' respect the orders because he is entitled to be 'truthful' in presenting all of his defense." Dr. Kelly opined that defendant "is presently acting in an ineffectual manner in his self-representation," and Dr. Kelly believed defendant was highly likely to continue to be ineffectual. Dr. Kelly explained, "[Defendant] is ineffectual despite the fact that he is capable of understanding the nature of the proceedings and he is capable of researching and learning how to represent himself in an effective manner. He has made appropriate motions, at times, but the idiosyncrasies of his Schizoid personality traits and his verbose communication style buries [*sic*] what would be a pertinent legal motion within highly distracting and repetitive political posturing thereby sabotaging the credibility and impact of his motion. [¶] The fact that he persists in bringing up ideas that are not directly relevant to the allegations is, in my opinion, the strongest evidence of lacking competency to represent himself." Dr. Kelly further stated that if defendant was not permitted to represent himself, he would continue to press his ideas at trial either through defense counsel or by testifying.

On February 2, 2022, Judge Faulder held a hearing on the question of defendant's competency to represent himself. Defendant confirmed that he reviewed Dr. Kelly's January 27th report and that he wished to continue representing himself. Defendant stated that he understood he would be

7

facing an experienced prosecutor and, "No lawyer can make any defense that would be better than me." Judge Faulder summarized Dr. Kelly's conclusion as finding that "while [defendant] may not be qualified to represent [himself] or maybe even competent to represent [himself], [defendant is] competent to choose to represent [himself]." Judge Faulder then asked defendant to state the charges, including the special allegations, which he did. Defendant stated that if he were found guilty he would face "199 years to life without parole." Judge Faulder reminded defendant that by representing himself he was giving up the right to appeal based on ineffective assistance of counsel and that if he were disruptive at trial the court could relieve him of the right to represent himself. Multiple times, Judge Faulder told defendant that self-representation was "unwise" and against the court's advice. Judge Faulder concluded by stating: "[I]f the question were do I think you are qualified to represent yourself or even competent in the sense of knowing the law or knowing how to represent yourself as a trained attorney would, I would find that you are not competent. But that is not the standard I have to follow. [¶] The standard I have to follow is whether or not you are competent to choose to represent yourself knowing the risks and consequences to self-representation. And in good conscience, I cannot make that finding. [¶] I find that you are, as Dr. Kelley [*sic*] pointed out, competent to choose to represent yourself."

## III.  *Evidence in Murder/Attempted Murder Trial*

At trial, among other evidence, the prosecution played recorded interviews defendant gave to the police following the murder. Defendant lived in a motor home on family property. Jamie Wilcox was defendant's stepson. Wilcox and his husband, Jayme G., lived in a house on the family property, and Wilcox owned an interest in the property. Defendant believed

8

Wilcox and Jayme G. planned to sell their part of the property and "screw everybody."

On September 23, 2020, at 6:30 a.m., defendant put a gun in his waistband and waited for Wilcox and Jayme G. to come out of their home and get into their car. When they did, defendant approached the car with the gun behind his back. Defendant asked them whether there was anything he could do to change their mind, and Jayme G. said no. Defendant then shot them both. The police were dispatched to the scene at 8:09 a.m. in response to Jayme G.'s 911 call. Wilcox had a gunshot wound to his head and to his neck. He was pronounced dead at the scene. Jayme G. was shot in his upper right arm, his hand, and his head. He suffered a fractured wrist and a fractured skull.

## DISCUSSION

### I. *Waiver of Right to Counsel*

#### A. Legal Principles

*Faretta* holds that the Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves when the defendant knowingly and intelligently elects to do so. (*Faretta, supra*, 422 U.S. at pp. 819–820, 835–836.) A self-represented defendant need not meet the standards of an attorney or even be capable of conducting "an effective defense." (*People v. Mickel* (2016) 2 Cal.5th 181, 206.) "[T]he cost of recognizing a criminal defendant's right to self-representation may result ' "in detriment to the defendant, if not outright unfairness." ' " (*Ibid.*) A defendant's decision to present no defense is a valid exercise of the right to control the defense. (*Id.* at p. 209.)

A criminal defendant also has the constitutional right not to stand trial while he or she is mentally incompetent. (*Indiana v. Edwards* (2008) 554

9

U.S. 164, 169–170 [171 L.Ed.2d 345].)  The constitutional test for mental competence to stand trial is "(1) 'whether' the defendant has 'a rational as well as factual understanding of the proceedings against him' and (2) whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.' " (*Ibid*.)  Section 1367, subdivision (a) similarly precludes prosecution while a defendant, "as a result of a mental health disorder or developmental disability . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

*Indiana v. Edwards, supra*, recognized the existence of "gray-area defendants" who are mentally competent to stand trial but "who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (554 U.S. at pp. 172–174, 178.) *Edwards* held that the Constitution permits states to impose a higher standard of mental competence for self-representation. (*Id*. at p. 178.)  In 2009, the California Supreme Court explained the permissive nature of the *Edwards* holding: "*Edwards* does not *mandate* the application of such a dual standard of competency for mentally ill defendants.  In other words, *Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing, and intelligent. [Citation.]  *Edwards* thus does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted." (*People v. Taylor* (2009) 47 Cal.4th 850, 878.)

In *People v. Johnson* (2012) 53 Cal.4th 519, the California Supreme Court decided "whether California courts may accept *Edwards*'s invitation and deny self-representation to gray-area defendants." (*Id.* at p. 527.) It held that they could and that "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.) "Trial courts must apply this standard cautiously" given that criminal defendants generally have a Sixth Amendment right to self-representation. (*Id.* at p. 531.) "Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides. Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Ibid.*) Determinations regarding self-representation are reviewed for abuse of discretion. (*Ibid.*) The trial court's competency determination must be upheld if supported by substantial evidence. (*Ibid.*)

## B. Trial Court Did Not Abuse Its Discretion When It Permitted Defendant to Represent Himself

Defendant argues he was not competent to waive his right to counsel. He concedes that there was evidence that he was capable of understanding the law and was capable of "mentally separating his views from the applicable California law." However, he contends, without record citations,[4]

---

[4] *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 990 ["California Rules of Court, rule 8.204(a)(1)(C) requires every reference to a matter in the appellate record be supported with a citation to the volume and

11

that "the record also demonstrates that he not only would not, but due to his delusional mental state could not, act in any manner that meaningfully advanced a defense based on California law." We find the trial court did not abuse its discretion when it permitted defendant to continue self-representation after it reviewed an additional court-ordered evaluation of defendant's competency to represent himself.

Dr. Kelly's January 27, 2022, report found defendant was not suffering from psychosis but had a personality disorder. Although Dr. Kelly opined that defendant was "presently acting in an ineffectual manner in his self-representation"; he also stated that defendant was capable of understanding the nature of the proceedings, researching and learning to represent himself effectively. Dr. Kelly also reported that defendant was acting knowingly, intelligently, and voluntarily; that he understood the dangers of self-representation; and that he even anticipated that the trial court would not allow him to present his political beliefs. Although defendant did not present an effective defense, that is not the standard for determining whether a defendant may represent him- or herself. (*People v. Mickel, supra*, 2 Cal.5th at p. 206 ["the critical question is not whether a self-represented defendant meets the standards of an attorney, or even whether a defendant is capable of conducting an effective defense" because the risks are "a cost that we allow defendants the choice of paying"].) Although Dr. Kelly's January 27, 2022, report concluded that defendant was acting in an "ineffectual manner in his self-representation," it also stated that defendant understood the proceedings and was capable of researching and learning to represent himself effectively. The record indicates that the trial court carefully considered, and

_____

page number of the record where the matter appears. The rule applies wherever a reference to a matter in the record appears in a brief"].)

12

reconsidered, whether defendant should be permitted to represent himself. The court agreed with Dr. Kelly and specifically found defendant was competent to choose to represent himself. There was no abuse of discretion.

Nor are we persuaded that the trial court did not understand its discretion to revoke defendant's right to self-representation under *Edwards*. The record here is distinguishable from *People v. Shiga* (2016) 6 Cal.App.5th 22, 40, which found the trial court erred in granting the defendant's *Faretta* motion because the record revealed that the trial court erroneously believed that a finding the defendant was competent to stand trial " 'tied' " its hands as to the determination of whether the defendant was also competent to represent himself. *Shiga* found the defendant made an affirmative showing that the court was unaware of its discretion "both to conduct an inquiry regarding whether defendant was mentally incapable of representing himself and, if necessary, to deny defendant's *Faretta* request on that ground." (*Ibid.*) This affirmative showing rebutted the general rule that the trial court is presumed to have been aware of and followed applicable law. (*Ibid.*)

Here, the record demonstrates that the trial court understood its discretion to both conduct an inquiry into whether defendant was mentally competent to continue representing himself and to revoke self-representation. Most significantly, on multiple occasions, the trial court voiced concerns about defendant's mental capacity to represent himself based on the motions he filed. The court then proceeded to actually conduct an inquiry as to whether defendant should be permitted to continue self-representation. As part of the trial court's inquiry, it obtained a second report from Dr. Kelly on the issue of defendant's competency to represent himself.

Defendant is incorrect in suggesting that the record does not indicate Judge Faulder was aware of *Edwards* or *Johnson*, which permit a court to

13

find that "gray-area defendants" may not represent themselves. Although Judge Faulder did not specifically mention *Edwards* or *Johnson* during the February 2, 2022 hearing, at a preceding hearing on January 31, 2022, the prosecutor asked the trial court to review *People v. Best* (2020) 49 Cal.App.5th 747, which discusses both *Edwards* and *Johnson*. (*People v. Best*, at p. 757.) The trial court noted the case citation and arranged for the prosecutor to provide a copy of the case to the defendant. The fact that the trial court did not specifically mention *Edwards* or *Johnson* in stating its decision to permit defendant to continue to represent himself does not warrant a departure from the general rule that the trial court is presumed to have been aware of and followed applicable law. (*People v. Shiga, supra*, 6 Cal.App.5th at p. 40.)

### C. Defendant's Waiver of the Right to Counsel Was Knowing

Defendant argues his waiver of the right to counsel was not knowing. We review a *Faretta* waiver de novo and examine the record as a whole to determine whether defendant understood the consequences of waiving the right to counsel. (*People v. Mickel, supra*, 2 Cal.5th at p. 211.) Specifically, defendant claims that he did not know that if he waived counsel and represented himself, he would not be allowed to present the immunity defense based on his position in the New Guard. According to defendant, he was "led to believe that he could present the immunity defense if he represented himself." Our review of the record belies defendant's claim.

Defendant filed a *Faretta* form stating he understood his constitutional rights and the dangers and disadvantages of self-representation. At the first *Faretta* hearing, on October 5, 2021, Judge Shanahan confirmed on the record that defendant understood his rights, and she told him self-representation is "never wise." She also specifically referred to defendant's

14

"ideas about the government" and cautioned that such information may not be allowed at trial and that "you may not be able to have the platform that you think you're going to have . . . ." Defendant said he understood. At the pretrial hearing on December 28, 2021, Judge Faulder again admonished defendant regarding the dangers of self-representation and confirmed that defendant understood. At a pretrial hearing on January 14, 2022, the prosecutor stated that he anticipated making motions in limine to preclude defendant from referencing "whether he holds the People's Chair in the People's Sphere of Action." Dr. Kelly's January 27, 2022 evaluation of defendant states that defendant was "acting knowingly, intelligently, voluntarily, and that he is aware of the general dangers of self-representation." It also states that defendant "anticipates in limine orders that he will disagree with, and he states that he will 'probably not' respect the orders because he is entitled to be 'truthful' in presenting his defense." At the February 2, 2022, hearing on the question of defendant's competency to continue self-representation, Judge Faulder again confirmed that defendant wished to continue to represent himself. Judge Faulder asked defendant to state the charges against him and the penalty he faced if he were found guilty, and defendant did so. Judge Faulder again reminded defendant that self-representation meant he was giving up the right to appeal based on ineffective assistance of counsel and that if defendant were disruptive at trial, the court could relieve him of the right to represent himself. Finally, Judge Faulder told defendant multiple times that self-representation was "unwise" and against the court's advice. On this record, defendant's waiver of the right to counsel was knowing.

## II. *Special Circumstances Findings*

### A. Substantial Evidence Supports Finding the Murder Was Carried Out for Financial Gain

Defendant argues that the jury's finding that he committed the murder for financial gain is not supported by substantial evidence. We disagree. The financial gain required to support a special circumstance finding does not need to be "the ' " 'dominant,' 'substantial,' or 'significant' motive for the murder." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 63.) Nor is it required that the intended financial benefit from the murder actually materialize. (*Ibid.*) Further, the special circumstance applies if the defendant carries out the murder for the financial gain of a third person. (*People v. Michaels* (2002) 28 Cal.4th 486, 520.)

The evidence, including defendant's statements to the police following the shooting, is that defendant convinced his sister to give Wilcox "resident tenancy on the property." Jayme G., the surviving victim, testified that Wilcox had an interest in the property on which defendant and his sister and other family members also lived. The day before the shooting, defendant learned that Jayme G. and Wilcox intended to sell what he described as "their quarter" of the property. Defendant wanted "to protect the property." He shot the victims because "they were going to destroy my family" and "sell [the property] out from under [his sister] and tear it apart." Defendant stated Wilcox "had to be dead to get off of the . . . deed."

Viewing the evidence in the light most favorable to the verdict, we find that a reasonable jury could conclude that defendant killed Wilcox to protect his family's ownership of, and interest in, the property. (*People v. Parker, supra*, 13 Cal.5th at p. 58.)

16

## B. Substantial Evidence Supports Lying-in-wait Finding

The lying-in-wait special circumstance instruction states: "A person commits a murder by means of lying in wait if: [¶] 1. He or she concealed his or her purpose from the person killed; [¶] 2. He or she waited and watched for an opportunity to act; [¶] 3. Then he or she made a surprise attack on the person killed from a position of advantage; [¶] AND [¶] 4. He or she intended to kill the person by taking the person by surprise." (CALCRIM No. 728.) Defendant concedes there was sufficient evidence of elements 3 and 4. However, he contends there was insubstantial evidence of elements 1 and 2. Defendant argues that his "true 'purpose'" in approaching the victims' car was not simply to kill Wilcox but, rather, to ask him if he had changed his mind about selling the property. We find sufficient evidence to support the jury's finding.

The evidence included defendant's statement to the police that he armed himself with a loaded gun around 6:30 a.m. the morning of the murder. He then "waited till they came out to get in the car . . . ." Defendant cocked the gun before approaching the car. He approached the victims with his gun hidden behind his back. Jayme G. testified that he did not see defendant's gun as he approached them. Defendant asked the victims, " 'Are you going to stop this?' " Jayme G. did not know what defendant was talking about and said, " 'Stop what?' " Defendant then immediately shot Wilcox and then Jayme G. Jayme G. called 911, and the police responded to the scene at 8:09 a.m.

The evidence is sufficient to support a finding of lying in wait. The jury could reasonably conclude that defendant concealed his purpose, and waited and watched for an opportunity to act, when he armed himself with a gun at 6:30 a.m.; waited for over an hour until the victims got into their car;

17

approached the car with a concealed, loaded gun behind his back; and then shot the victims immediately after Jayme G. expressed confusion about what defendant had asked them.

Nor are we persuaded that *People v. Becerrada* (2017) 2 Cal.5th 1009, which defendant cites, requires reversal of the lying-in-wait finding. In *Becerrada*, the Supreme Court reversed a lying-in-wait special circumstance for insufficient evidence. (*Id.* at pp. 1028–1029.) The defendant threatened to kill the victim if she did not dismiss rape charges against him. (*Id.* at pp. 1015, 1029.) After a phone call from the defendant, the victim went to his house, where she was murdered. (*Id.* at p. 1029.) The prosecution's theory to support the lying-in-wait special circumstance was that defendant lured the victim to his home, intending to kill her after learning she would not drop the rape charges. (*Id.* at pp. 1028–1029.) The evidence supported a finding that defendant intended to kill the victim if she failed to drop the rape charges; however, the court emphasized there was no evidence "defendant learned before [the victim's] fatal trip to his home that [the victim] had not dropped the charges." (*Id.* at p. 1029, italics omitted.) The court concluded there was insufficient evidence to establish the requisite period of watching and waiting because there was no evidence to support a finding that defendant lured the victim to his home intending to kill her. (*Ibid.*)

Here, there is evidence that defendant planned to kill Wilcox "to get [him] off of the . . . deed" and that he armed himself and waited until the victims were in their car before approaching them with a gun behind his back. The fact that he asked, " 'Are you going to stop this?' " before shooting Wilcox does not negate the lying-in-wait finding. Notably, Jayme G. testified that his response to defendant's question was, " 'Stop what?' " which did not definitely indicate any intention or imminent plan to sell a share of the

18

property. Nonetheless, without any further discussion, defendant immediately shot the victims. In defendant's statement to the police, he said that he asked whether there was anything he could do to change their minds, and Jayme G. said no. However, it is for the jury to determine which evidence to credit. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) In reviewing for substantial evidence, we do not reverse simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) Sufficient evidence supports the jury's finding.

III. *Sentencing Error*

Defendant was sentenced as follows: (1) life without parole on count one; (2) 25 years to life for the firearm enhancement on count one; (3) 14 years to life on count two; (4) 25 years to life for the firearm enhancement on count two; (5) 30 years for the prior serious felony convictions as to count one; and (6) 30 years for the prior serious felony convictions as to count two. Defendant contends, and the People agree, that the trial court erred in its calculation of the prior serious felony conviction enhancements.

Section 667, subdivision (a)(1) states: "A person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively." Defendant has six prior felony convictions for robbery in 1979. However, the six convictions arose from only two separately brought and tried cases: the one in Sonoma County that resulted in three convictions and the other in Lake County that also resulted in three convictions. Defendant's six prior felony convictions are the result of

19

only two cases that were "brought and tried separately," and, therefore, under section 667, subdivision (a)(1) only two five-year enhancements should be imposed for each count. (*People v. Jones* (2015) 236 Cal.App.4th 1411, 1416.) Accordingly, we will remand for the trial court to vacate the additional five-year enhancements.

## DISPOSITION

The matter is remanded with directions that the trial court vacate the erroneously imposed additional five-year prior serious felony enhancements and correct the abstract of judgment to reflect imposition of two five-year prior serious felony enhancements on count one and two five-year prior serious felony enhancements on count two. In all other respects, the judgment is affirmed.


Jackson, P. J.


WE CONCUR:

Simons, J.
Burns, J.


A165177/*People v. Thomas Dean Jones*